Chicago, Rock Island and Pacific Railroad Co

*v.*

Anslow Bell, Admr.

1. Evidence—*declarations of third party.* In an action against a railroad company, to recover damages for killing the plaintiff's intestate through a collision at a road crossing, the company sought to prove the declarations of a person who was riding with the deceased in his wagon at the time, made just after the accident, which the court refused: *Held*, that the evidence was inadmissible, the person injured being in a dying condition, and not capable of assenting to what was said.

2. Same—*relevancy of evidence as to habits of party killed.* In an action to recover of a railroad company for the killing of a person,

where the negligence of the deceased, as well as that of the company, was involved, the company inquired of a witness as to the habits of the deceased in general, without specification as to the sort of habits sought to be proved, which the court excluded: *Held*, that the court was justified in rejecting the offered testimony, for the reason that the habits were not particularized so as to show their bearing on the case.

3. Witness—*impeachment as to former statements.* Where a witness is asked, on cross-examination, whether he had made a particular statement before the trial, which is incompetent, as not relating to anything testified to by him on his direct examination, and collateral, his answer must be taken as conclusive, and can not be contradicted by other witnesses.

4. Negligence — *contributory.* It is the duty of persons about to cross a railroad, to look about them and see if there is danger,—not to go recklessly upon the road, but to take the proper precautions themselves, to avoid accidents at such places. If a party rushes into danger, which, by ordinary care, he could have seen and avoided, no rule of law or justice can be invoked to compensate him for any injury he may receive.

5. In general, it is deemed culpable negligence to cross the track of a railroad without looking in every direction that the rails run, to make sure that the road is clear, as also to attempt to drive a team across the track of a railroad in full view of an approaching locomotive.

6. Where a party was killed by a locomotive colliding with his wagon and team, while in the act of crossing the railroad track at a public crossing, in the night time, and it appeared that it was very calm, still and dark, that the train was lighted up, and there was a bright head-light, that there was nothing to obstruct its view from the deceased, as it was approaching, for some distance, and that he must have heard the noise; that the deceased was addicted to hard drinking, and was probably under the influence of liquor, and that his team came upon the crossing in a run, so as not to be seen by those in charge of the train until it was upon the track, it was *held*, that, owing to the negligence of the deceased, no recovery could be had by his personal representative against the company, for causing his death, and injury to his team and wagon.

7. Same—*neglect to ring bell, etc.* If a traveler on the highway has notice of an approaching train in time to avoid a collision upon the crossing, the object of ringing a bell or sounding a whistle is subserved, and the failure to perform such acts, or either of them, can not be held to be the cause of an injury resulting from a collision, under such circumstances.

Appeal from the Circuit Court of Grundy county; the Hon. Josiah McRoberts, Judge, presiding.

Mr. Thomas F. Witherow, for the appellant.

Messrs. Hunter & Page, for the appellee.

Mr. Justice Sheldon delivered the opinion of the Court:

The plaintiff in the court below commenced two actions against the railroad company, founded upon a collision between a train on the defendant's railroad and the wagon and team of John Boyd, deceased, the plaintiff's intestate, at a highway crossing near Minooka, in Grundy county. One action was for damages sustained by the death of Boyd, and the other for damages resulting from the killing of his horses and the destruction of his wagon and harness.

The declaration alleged, as the negligence of the defendant which caused the collision, an omission to ring the bell or blow the whistle for a distance of 80 rods before reaching the crossing, as required by the statute. The cases were consolidated.

Verdicts and judgments were rendered in favor of the plaintiff in both cases, and the defendant has appealed.

It is assigned for error, that the court below excluded the declaration of one Mitchell, a person who was riding at the time with Boyd, made just after the collision, as to the condition Boyd was in at the time of the accident.

We know of no principle which would justify the admission of such declaration.

There could arise no inference of assent to it, on the part of Boyd, from his silence, as he was in a dying condition at the time. It is said they were joint wrong-doers, and that the admission of one joint wrong-doer is evidence against both. We fail to see how they could be considered as joint wrong-doers. Mitchell was riding with Boyd merely as a passenger. That is all there is in the case to affect Mitchell.

It is urged that the court erred in excluding the testimony of witnesses as to what Meade, one of the plaintiff's witnesses,

said, at the time of the accident, in regard to Boyd's habit of going home intoxicated.

The testimony was not admissible for the purpose of impeaching Meade, as he had given no evidence upon that subject. It is true, he was asked, on cross-examination, whether he had not made such a statement, and denied it. But the question was incompetent, as it was not relevant to any testimony which the witness had given, and his answer, it being as to a collateral matter, had to be taken as conclusive. It was not admissible afterward to contradict him in that respect, and thus introduce into the case his unsworn statements. If defendant sought any statement of Meade upon that subject, it should have examined him as a witness, and got his sworn statement.

It is insisted that the court below erred in excluding evidence of what were the personal habits of the deceased when intoxicated. The inquiry was general, without any specification of the sort of habits sought to be proved.

We think the court was justified in rejecting the offered testimony, without some particularizing of the habits offered to be proved, so that it might be seen that they were such as that the proof of them would have a legitimate bearing upon the issue.

It is insisted that the verdict was manifestly against the evidence and the instructions of the court.

There is some apparent conflict in the testimony as to the alleged negligence in failing to ring the bell. Eight witnesses testified that they did not hear the bell ring, only one of them undertaking to testify positively that it was not rung. Of these witnesses, not one was nearer than 80 rods from the train. Three of them were 200 rods away, and one a mile and a-half. Five witnesses introduced by the defendant testified positively that the bell was rung, one of them, that he rang it himself. Three of these witnesses were disconnected with the road, and apparently disinterested, being passengers on the train. Upon any fair weighing of the testimony on

this point, it would seem to be in favor of the appellant. But, were it otherwise, we are of opinion that the deceased's own want of proper care contributed directly to the injury, and should prevent a recovery.

This court has said, "it is the duty of persons about to cross a railroad, to look about them, and see if there is danger—not to go recklessly upon the road, but to take the proper precautions themselves to avoid accidents at such places. If a party rushes into a danger which, by ordinary care, he could have seen and avoided, no rule of law or justice can be invoked to compensate him for any injury he may so receive." *Chi. and A. R. R. Co.* v. *Gretzner*, 46 Ill. 82; and see, *St. L., A. and T. H. R. R. Co.* v. *Manly*, 58 Ill. 300.

And it is the general rule, that it is deemed culpable negligence to cross the track of a railroad without looking in every direction that the rails run, to make sure that the road is clear, as also to attempt to drive a team across the track of a railroad in full view of an approaching locomotive. Shearm. & Redf. on Negligence, §§ 488, 489, and cases cited in notes.

We find, from the evidence, that the accident occurred in the night time; that the night was calm, very still and dark, and the atmosphere clear. Boyd, in his approach to the crossing where the collision occurred, was on the north side of the railroad, traveling south on a highway running north and south on a section line. The railroad crosses it running in a south-westerly direction. Before reaching the crossing, the railroad passes through a cut, the south-westerly extremity of which is 140 rods from the crossing. From the end of this cut to the crossing, the railroad passes along on an embankment, which, at the crossing, is about 12 feet above the surrounding country, the grade descending, from the cut to the crossing, about 28 feet per mile. The cars were lighted. The head-light rested on the front of the engine about six feet above the level of the railroad. This would place the head-light, when the engine emerged from the cut, some 27 feet above the road on which the deceased was traveling

toward the crossing. It must have been at least 16 feet above the highway when Boyd was at a point 150 feet from the crossing.

The country is an open one, and the land upon the north side of the railroad generally flat. Did not the deceased see the approaching train?

There is some evidence tending to show that the view of the train might have been obstructed by a field of corn between the highway and the railroad, and by trees that were growing on the side of the railroad embankment. But, after considering all the testimony on this head, we are satisfied that the deceased, in the exercise of ordinary care, must have seen the approaching train.

The witness Meade was 80 rods from the crossing, and a mile and a-half from Minooka, and he saw the train as it left that station, saw it after it came out of the cut, heard the noise of it quite distinctly, and saw the head-light. Feehan was distant 200 rods, saw the train from the cut to the crossing, saw the lights in the cars, and heard the noise of the train. Convis was at his house, a mile and a-half from the crossing, and heard the train until the crash. James Clennan, traveling north on the road on which Boyd was going south, heard the noise of the train a distance of 200 rods. Boyd, then, too, must have heard, as well as seen, the approaching train. The ringing of the bell or sounding the whistle is but for the purpose of giving notice of the approach of the train. If the traveler on the highway has such notice otherwise, in season to avoid a collision upon a crossing, the object of ringing the bell or sounding the whistle is subserved, and the failure to perform said acts, or either of them, can not be held to be the cause of an injury which may result from such collision.

The testimony was, that the team of Boyd was not seen by those in charge of the train until the moment it came upon the crossing, and that the horses came upon it on a run.

Boyd appears to have been acquainted with the locality. He was in the habit of traveling over it.

The afternoon before the accident, Boyd was at the house of the appellee, Bell, his father-in-law, and there met two friends, Mitchell and Leeper, but a short time from their old home in Ireland, whom Boyd then met for the first time after their separation several years before.   Bell's house was on the south side of the railroad, on a road running east and west, and was about three-quarters of a mile south from Minooka, a station on the railroad on its north side.

Boyd lived about five miles west from Bell, and also on the south side of the railroad.   About half past six o'clock P. M., in November, Boyd started for home from Bell's house, taking along with him, in his wagon, Mitchell and Leeper, by the roundabout road by way of Minooka.   They stopped at that place and paid a visit to a drinking saloon there.   Boyd is shown to have been a convivial man, and, as the witnesses term, a drinking man, who was in the habit occasionally of getting intoxicated when he came to town.   True, there is evidence that, when he left Minooka, he showed no signs of intoxication.   This might have been, and yet, by the time he reached the crossing, some two miles distant, half an hour later, he might have been under the undue influence of intoxicating liquors drank at Minooka, which incited his apparently rash conduct.

In view of all the circumstances, the conclusion forces itself upon the mind, that the deceased, being fully apprised of the approach of the train, recklessly ventured upon the crossing in front of the advancing train; or that, if not so apprised, it was for the want of the simple precaution of looking and listening to find out whether a train was approaching, which would be a lack of common care and common caution; and in either event, the deceased's own want of ordinary care would have contributed directly to the injury, which, under the well settled doctrine, would preclude a recovery for any damage sustained.

We are of opinion that the verdict was manifestly against the evidence, and that the judgment should be reversed.

*Judgment reversed.*